**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DANIEL RAMIREZ,** *et al.*,

Plaintiffs,

v.                                                          Case No. 21-cv-1099 (CRC)

**ANTONY BLINKEN,** *et al.*,

Defendants.

---

<u>**MEMORANDUM OPINION**</u>

The plaintiffs in this case are U.S. citizens and their non-citizen fiancés with K-1 visa applications pending or soon to be pending at the U.S. Embassy in Manila, Philippines. They have sued the Department of State and its Secretary under the Administrative Procedure Act and the Mandamus Act, challenging the delay in adjudicating their applications. In their claims for relief, the plaintiffs object not only to how long the Department has taken to process their files, but also to how the Department and the Embassy have prioritized them.

The Department and the Secretary move to dismiss the complaint. The Court will do so in part. The plaintiffs have failed to state a claim with Count 2, which challenges as arbitrary and capricious the Department and Manila Embassy's alleged deprioritizing of K-1 visa applications. However, the Court concludes that many of these same allegations about the Manila Embassy can properly support the plaintiffs' claims in Counts 1 and 3, which focus on whether their wait for a visa adjudication has been unreasonable. In particular, the plaintiffs have plausibly alleged that the Embassy has failed to follow the reasoned, four-tier triage scheme that the Department imposed on consular posts several months into the COVID-19 pandemic. Because such an allegation would support a claim that the delay the plaintiffs have experienced is unreasonable, the Court will deny the motion to dismiss as to Counts 1 and 3.

I.   **Background**

A.  The K-1 Visa Program

A K-1 visa allows non-citizen fiancés of U.S. citizens to travel to the United States to marry.  See *Visas for Fiancé(e)s of U.S. Citizens*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/family/family-of-us-citizens/visas-for-fiancees-of-us-citizens (last visited Mar. 22, 2022) ("USCIS Visa Information").[1]  It is one of several types of K visas, which also cover non-citizen spouses and eligible children of fiancés and spouses.  See 9 FAM 502.7-3(B)(a)–(b).

To obtain a K-1 visa, a U.S. citizen who is engaged to be married must first file a Petition for Alien Fiancé(e)—or Form I-129F—with U.S. Citizenship and Immigration Services ("USCIS").  See USCIS Visa Information, supra.  If USCIS agrees that the fiancé is eligible, it will approve the petition and send it to the State Department's National Visa Center ("NVC") for further processing.  Id.  When it receives an approved petition, the NVC assigns a case number, forwards the petition to the U.S. embassy or consulate where the non-citizen fiancé lives, and sends the non-citizen fiancé information on how to apply for a K-1 visa.  *Nonimmigrant Visa for a Fianc(é)e (K-1)*, U.S. Dep't of State Bureau of Consular Affs., https://travel.state.gov/content/travel/en/us-visas/immigrate/family-immigration/nonimmigrant-visa-for-a-fiance-k-1.html (last visited Mar. 22, 2022).  The non-citizen fiancé must then submit a K-1 visa application to the appropriate embassy or consulate, pay a fee, and gather specified material for review by a consular officer at an interview.  Id.

---

[1] The Court takes judicial notice of this and other information posted on official government websites.  See Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs., 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014).

"The interview with the consular officer is the most significant part of the visa issuing process." 9 FAM 502.7-3(C)(2)(a)(1).  An interview can be scheduled once the applicant reports that all required documents have been collected, and the necessary medical examination has been completed.  9 FAM 502.7-3(C)(4)(a).  At the interview, a consular officer may grant or deny the K-1 visa.  USCIS Visa Information, supra.  If granted, the visa is valid for a single entry to the United States for up to six months.  Id.  After admission on the visa at a port of entry, a K-1 visa holder has 90 days to marry the U.S. citizen fiancé.  Id.  Upon marriage, the visa holder may apply for adjustment to lawful permanent residence status.  Id.

   B.  The Plaintiffs' K-1 Visa Applications

The plaintiffs are U.S. citizens with an approved I-129F Petition for Alien Fiancé(e), along with their respective non-citizen fiancés.  See Compl. ¶ 9.  The complaint included 140 fiancé pairs.  Id.  Since this case was filed, however, several dozen plaintiffs have voluntarily dismissed their claims, either because they have received their visas or because they no longer wish to pursue their claims.  See Mot. Voluntarily Dismiss at 1, ECF No. 9; Notice of Voluntary Dismissal at 2, ECF No. 11.  The plaintiffs report that, as of March 1, 2022, a further fourteen plaintiffs have had their final visa applications adjudicated.  See Pl.'s Status Report at 1–2, ECF No. 12 ("Pl.'s Mar. 2022 Update").  Each remaining non-citizen fiancé plaintiff either has an application for a K-1 visa pending with the U.S. Embassy in Manila, or is awaiting transfer of his or her case from the NVC to the Manila Embassy.[2]  Compl. ¶ 9.  The filer of the oldest of the

---

[2] At the time of briefing, the application of one plaintiff had been forwarded to the U.S. Embassy in Abu Dhabi, United Arab Emirates, for processing.  See Drinkall Aff., ECF No. 7-1 (noting that application of plaintiff Laila Villaverde had been "forwarded to the incorrect embassy").  According to the U.S. Department of State's Visa Status Check system, that application is now pending with the Manila Embassy.  See Visa Status Check, U.S. Dep't of State Consular Electronic Application Center, https://ceac.state.gov/ceacstattracker/status.aspx

still-pending applications has been awaiting a final adjudication since February 2020.  See Pl.'s Mar. 2022 Update at 5 (noting "documentarily complete" date).

    C.  Visa Processing and the COVID-19 Pandemic

    The COVID-19 pandemic has upended the State Department's processing of all visas, including K-1 visas.  In March 2020, the Secretary of State directed all diplomatic and consular posts to suspend all routine visa services, and to provide only mission-critical and emergency visa services as necessary.  See Compl. Ex. B ¶ 1 (Mar. 20, 2020 State Department Bulletin). The Department began a phased resumption of routine services in July 2020.  Compl. Ex. D ¶ 1 (July 8, 2020 State Department Bulletin).  But restrictions imposed by host governments on travel and capacity, safeguards to reduce the transmission of the coronavirus, and reduced staffing levels due to illness and quarantine all continue to impact consulates' ability to fully resume visa services.  See Compl. Ex. D ¶¶ 2–3; Vermillion Decl. ¶ 4.[3]

    The Manila Embassy—where the plaintiffs' applications are or will soon be pending— has experienced these pandemic-induced capacity restrictions.  Since the beginning of the pandemic, the Embassy has had only limited ability to offer visa services, due at least in part to reduced staffing.  Vermillion Decl. ¶¶ 9–10; see also Visa Update: Consular Operations (Visas) as of October 2021, U.S. Embassy in the Philippines, https://ph.usembassy.gov/visa-update-consular-operations-visas-as-of-october-2021 (last visited Mar. 22, 2022).  As of June 2021, when the government filed its motion to dismiss, the Manila Embassy was working at

_____

(search for Ms. Villaverde's case as of Mar. 22, 2022).  Accordingly, the Court need not address the government's discussion of the U.S. Embassy in Abu Dhabi.

    [3] The government attached the declaration of Department official Neal Vermillion to its motion to dismiss.  The Court provides this information as background only, and does not rely on it for any substantive holding.  See Sierra v. Hayden, 254 F. Supp. 3d 230, 237 (D.D.C. 2017) (noting limits of what courts can rely on without converting to summary judgment motion).

"approximately one-fourth its normal capacity."  Vermillion Decl. ¶ 9.  And even as it has resumed visa processing and regained capacity, the Embassy has had to contend with a significant backlog of cases:  As of June 2021, 3,593 K-1 visa applications were pending at the Manila Embassy itself, and a further 3,912 K-1 visa cases pending at the NVC were ultimately destined for processing in Manila.  Id. ¶ 11.  The Embassy likewise had a large backlog of immigrant visa cases.  Id.

To address these backlogs in Manila and elsewhere, the State Department "authorized" consular officials "to give K visa cases high priority" beginning in August 2020.  See *Important Notice for K Visa Applicants Affected by COVID-19*, U.S. Dep't of State Bureau of Consular Affs. (Aug. 31, 2020), https://travel.state.gov/content/travel/en/News/visas-news/important-notice-for-k-visa-applicants-affected-by-covid-19.html.  Months later, the Department adopted a "tiered approach to triag[ing]" visa applications, including for K-1 fiancé visas.  See Defs.' Mem. in Supp. of Mot. Dismiss ("MTD") at 5–6, ECF No. 6-1; see also *Immigrant Visa Prioritization*, U.S. Dep't of State Bureau of Consular Affs., http://web.archive.org/web/20210909040734/https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-prioritization.html (last visited Mar. 22, 2022).  Implemented in November 2020 and publicly announced on April 30, 2021, the policy places fiancé visas in the second priority tier, alongside immediate-relative and returning-resident visas.  MTD at 5–6.  Only files with particularly pressing time concerns—immediate relative international adoptions, applicants who would soon age out, and certain Special Immigrant Visas for Afghan and Iraqi nationals—were given higher priority.  Id.  However, the Department also noted that "consular sections, where possible, [we]re scheduling some appointments within all four priority tiers every month."  Id.

D.  Procedural History

The plaintiffs filed suit on April 21, 2021, naming Secretary of State Antony Blinken and the State Department as defendants.  Compl. ¶¶ 14–15.  The complaint contains two sets of claims.  First, the plaintiffs challenge the prioritization of K visa applications, by both the Department as a whole and the Manila Embassy in particular.  Specifically, they allege that "de-prioritizing" and "suspending the adjudication of" K visas was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  See id. ¶¶ 69–75 (Count 2); id. ¶¶ 44–50 (alleging that the Manila Embassy had unlawfully deviated from the Department's stated visa-processing priorities).  Second, the plaintiffs claim that the government unreasonably delayed the adjudication of their visa applications.  They ask for a declaration that this alleged failure to act violates the APA and seek a writ of mandamus to compel the government to adjudicate their applications.  See id. ¶¶ 60–68 (Count 1); id. ¶¶ 76–79 (Count 3).  The government has moved to dismiss all counts for either lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim under Rule 12(b)(6).

**II.  Legal Standards**

A.  Dismissal for Lack of Subject Matter Jurisdiction

A motion under Rule 12(b)(1) "presents a threshold challenge to a court's jurisdiction." Ctr. for Biological Diversity v. Jackson, 815 F. Supp. 2d 85, 89 (D.D.C. 2011) (citing Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  A plaintiff opposing such a motion "bears the burden of demonstrating the court's subject-matter jurisdiction over its claim by a preponderance of the evidence."  Marine Wholesale & Warehouse Co. v. United States, 315 F. Supp. 3d 498, 508 (D.D.C. 2018) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  "When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all

uncontroverted material factual allegations contained in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determine jurisdictional questions.'" Id. at 509 (quoting Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011)).  However, "the court may consider documents outside the pleadings to assure itself that it has jurisdiction."  Sandoval v. U.S. Dep't of Justice, 322 F. Supp. 3d 101, 104 (D.D.C. 2018) (Cooper, J.); see also Haase, 835 F.2d at 906.

B.  Dismissal for Failure to State a Claim

Rule 12(b)(6) requires the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  In evaluating a complaint, the Court must "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs," but need not "accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." Owens v. BNP Paribas, S.A., 897 F.3d 266, 272 (D.C. Cir. 2018) (internal citations and quotation marks omitted).  In addition to the allegations within the four corners of the complaint, the Court may consider "documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006).

### III.  Analysis

The government has moved to dismiss all three counts in the complaint, for either lack of subject matter jurisdiction or failure to state a claim.  See MTD at 13–32.  It also contends that certain plaintiffs' claims are moot, now that a consular officer has adjudicated their visa applications.  See id. at 12–13.  The plaintiffs do not object to the dismissal of those who have received a final adjudication, but otherwise oppose the government's motion.

As explained below, the Court will grant the motion in part and deny it in part.  The Court will dismiss Count 2—the pure "Prioritization Claim."  The Court agrees with the government that how to prioritize the review of pending visa applications during an emergency is committed to the Department's discretion, and thus unreviewable under the APA.  And the plaintiffs cannot challenge the Manila Embassy's alleged failure to follow this prioritization scheme as arbitrary and capricious because they have identified no final agency action amenable to such an APA claim.  But Counts 1 and 3—referred to here as the "Visa Processing Delay Claims"—survive the motion to dismiss in a narrowed form.  With these claims, too, the plaintiffs assert that the Manila Embassy has "gone rogue," refusing to follow the reasoned prioritization scheme the State Department announced.  Because the plaintiffs have offered statistical evidence that lends plausibility to their suggestion that the time it has taken to adjudicate their applications may not be governed by a "rule of reason," the Court cannot reject their claims without a further developed record.  Accordingly, the Court will allow the plaintiffs' delay claims to survive the motion to dismiss insofar as they center on alleged failures by the Department and its Embassy to follow the governing triage system.

A. <u>Mootness</u>

The government first asks the Court to dismiss as moot the claim of any plaintiff who has "completed a K-1 nonimmigrant visa interview," resulting in a consular official's issuance or refusal to issue a visa. MTD at 12. Mootness goes to the Court's subject matter jurisdiction, as federal courts' constitutional authority to decide cases extends only to live cases or controversies. <u>See</u> <u>Iron Arrow Honor Soc'y v. Heckler</u>, 464 U.S. 67, 70 (1983). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (internal quotation marks omitted).

The Court begins with a group of plaintiffs that all parties agree are left with only moot claims: those whose applications have been finally adjudicated. The plaintiffs do not oppose their dismissal, and indeed have dismissed two similar tranches of plaintiffs already. <u>See</u> Opp'n at 23. Accordingly, the Court will now dismiss the claims of the fourteen remaining plaintiff-applicants—and those of their fourteen citizen-petitioner partners—whose applications have been adjudicated.[4]

The parties disagree on the viability of a second set of plaintiffs' claims: those who have completed a consular interview but are still awaiting a final decision. <u>See</u> Opp'n at 23; Reply at 3–4; Pl.'s Mar. 2022 Update at 5 (noting that at least some plaintiffs have completed interviews

---

[4] Those plaintiffs are Clarance Baker, Cherryl Timkang, Reuel Bornick, Jomarie Rey, James Davis, Mary Antonniette Policer, Joselito Espiritu, Ranniza Lyn Casenas, Timothy Faulkner, Patrocenia Norombaba, Matthew Johnson, Decemie Quimno, Raymund Labiscase, Roesian Marie Ceballos, Ariel Cates Leonado, Uriel Timothy Pineda, Jorelle Pacia, Alyssa Louise Nieves, Benjamin Shannon, Sanderlie Mirambel, Cameron Stillson, Vincynth Café, Shaun Tuomi, Cherish Arcona, Jeffrey Wishnia, April Riza Joy Ganzon, Jason Wulf, and Kimberly Villagracia. <u>See</u> Pl.'s Mar. 2022 Update at 1–2.

but not had their applications adjudicated).  The Court agrees with the plaintiffs that completion

of a consular interview is not enough to moot a claim.  While a visa application must be either

granted or refused at an initial interview, that refusal is often not final.  Instead, a refusal may be

entered for "administrative processing," and applicants may have an opportunity to provide

additional information to establish eligibility.  See 9 FAM 306.2-2(A)(a)(2)(a); *Administrative*

*Processing Information*, U.S. Dep't of State Bureau of Consular Affs., https://travel.state.gov/

content/travel/en/us-visas/visa-information-resources/administrative-processing-

information.html (last visited Mar. 22, 2022).  In similar contexts, courts have found that such

refusals for further "administrative processing" do not constitute a final adjudication of the visa

application.  See, e.g., Carter v. U.S. Dep't of Homeland Sec., No. 21-cv-422, 2021 WL

6062655, at *3 n.3 (D.D.C. Dec. 22, 2021) ("[R]efusals followed by 'administrative processing'

are not 'final decisions.'"); Joorabi v. Pompeo, 464 F. Supp. 3d 93, 100 (D.D.C. 2020); Vulupala

v. Barr, 438 F. Supp. 3d 93, 98–99 (D.D.C. 2020); Nine Iraqi Allies v. Kerry, 168 F. Supp. 3d

268, 284–91 (D.D.C. 2016).  Accordingly, none of the other plaintiffs' claims are moot.

> B.  Prioritization Claim (Count 2)

In Count 2, the plaintiffs allege that the Secretary acted arbitrarily and capriciously, in

violation of 5 U.S.C. § 706(2), by deprioritizing and suspending the issuance of K visas during

the pandemic.  See Compl. ¶¶ 69–75.  Although it is not entirely clear from the complaint and

briefing, in an abundance of caution, the Court will construe this count to encompass two

different complaints about the Department's prioritization of K visas:  one concerns the

Secretary of State's various visa prioritization decisions over the course of the pandemic; the

other is about the Manila Embassy's alleged failure to follow the four-tier scheme the Secretary

eventually laid out.  For the reasons below, the Court finds it must dismiss both versions of this arbitrary and capricious claim.

The first aspect of this claim relates broadly to the prioritization decisions of the Secretary.  The complaint mentions, among other actions, the Secretary's suspension of routine visa adjudications in March 2020, the decision not to designate K visas as "mission-critical" at that time, and instructions in the summer of 2020 to only process K visas once visa posts entered a later stage of pandemic reopening.  See Compl. ¶¶ 39–42.  Because these policies are no longer in force, the plaintiffs' claim for injunctive relief relating to them is moot.  See Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2006) ("[T]he Constitution nowhere licenses us to rule on the legality of an agency policy that no longer exists[.]").  In their motion to dismiss briefing, the plaintiffs suggest that their prioritization claim also covers the Secretary's four-tier system for application processing—announced publicly a week after the filing of the complaint—which places K visas in the second priority group.  See Opp'n at 22.  On that challenge, the Court agrees with the government that such matters are committed to agency discretion, precluding judicial review here.[5]

Although there is "a strong presumption of reviewability" under the APA, "section 701(a) expressly precludes judicial review of 'agency action . . . committed to agency discretion by law.'"  Physicians for Soc. Resp. v. Wheeler, 956 F.3d 634, 642 (D.C. Cir. 2020) (internal citation omitted) (quoting 5 U.S.C. § 701(a)(2)).  This section precludes review for a subset of agency actions that are "presumed immune"—including the decision not to institute enforcement

_____

[5] Even if the Court had not found the objections to the prior policies moot, the Court would likewise dismiss these challenges because the Secretary's decisions there, too, were committed to his discretion by law.

proceedings, allocations from lump-sum appropriations, and similar administrative determinations that "courts traditionally have regarded" as within the sole province of the agency.  Id.  It also precludes review of a separate set of otherwise reviewable actions when the guiding "statutes are drawn in such broad terms that in a given case there is no law to apply."  Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)).  The exception has been read "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  Dep't of Com. v. New York, 139 S. Ct. 2551, 2568 (2019) (internal quotation marks omitted).

The Secretary's prioritization decisions fall into this limited exception, so the Court will dismiss this portion of Count 2 for failure to state a claim.[6]  As another court in this district has noted, when evaluating a similar challenge to the Secretary's efforts to address visa processing during the pandemic, "the determination and prioritization of 'mission critical' functions during a time of crisis and administrative triage lies squarely within the discretion of the Secretary of State, under 22 U.S.C. § 2651a, and [are] not subject to judicial review."  Tate v. Pompeo, 513 F. Supp. 3d 132, 148 n.8 (D.D.C. 2021); see also 22 U.S.C. § 2651a(a)(3)(A) ("The Secretary shall administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State, except where authority is inherent in or vested in the President.").

---

[6] The government urges the Court to dismiss Count 2 for lack of jurisdiction on this ground.  But the D.C. Circuit has clarified that whether a complaint has sought "review of agency action committed to agency discretion by law" goes to failure to state a claim "under Rule 12(b)(6), not . . . the jurisdictional provision of Rule 12(b)(1)."  Sierra Club v. Jackson, 648 F.3d 848, 854 (D.C. Cir. 2011).

On occasion, courts have allowed challenges to State Department visa prioritization schemes past this initial hurdle.  But, notably, they have only done so in the context of diversity visas—where Congress supplied a statutory deadline for adjudication, and the Secretary's prioritization scheme ignored that limit or otherwise rested on misinterpretations of law.  See Gomez v. Biden, No. 20-cv-1419, 2021 WL 3663535, at *17 (D.D.C. Aug. 17, 2021); Filazapovich v. Dep't of State, No. 21-cv-943, 2021 WL 4127726, at *21 (D.D.C. Sept. 9, 2021). Here, there are no guiding principles the Court could use to evaluate the propriety of the Secretary's triage scheme.  The Court therefore dismisses Count 2—to the extent it challenges decisions by the Secretary—for failure to state a claim.

The Court construes the plaintiffs' arbitrary and capricious claim to focus also on the Manila Embassy, which they characterize as a "rogue consulate that is failing to comply with the reasoned decision making of the entire Department of State."  Opp'n at 6–7.  The government does not address this version of the prioritization claim in its motion to dismiss, and the plaintiffs' opposition brief largely discusses the Manila Embassy in the context of Counts 1 and 3, instead.  To the extent the plaintiffs still press this version of the claim, as laid out in their complaint, the Court will dismiss it *sua sponte* for failure to state a viable APA claim.  See Cheeks v. Fort Myer Constr. Co., 722 F. Supp. 2d 93, 112 (D.D.C. 2010) ("[I]t is well settled in this Circuit that a court may dismiss a complaint *sua sponte* pursuant to Rule 12(b)(6) where it is patently obvious that the plaintiff cannot prevail on the facts alleged in the complaint.").

The "Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'"  Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003) (quoting 5 U.S.C. § 704).  "Final agency action 'mark[s] the consummation of the agency's decisionmaking process' and is 'one by which

rights or obligations have been determined, or from which legal consequences will flow.'"  Id. (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)).  The plaintiffs' complaints about the Manila Embassy do not focus on any discrete agency decision or policy.  Rather, they criticize the Embassy for "appear[ing] to . . . deviat[e] from the Department of State's" policies, and "failing to follow" its "directive."  Compl. ¶¶ 44, 47.  Because the plaintiffs have not "identified a final agency action that they wish to challenge," the Court must dismiss this version of their prioritization claim as well.  See Tate, 513 F. Supp. 3d at 148 n.8.

      C.  Visa Processing Delay Claims (Counts 1 and 3)

      With Counts 1 and 3, the plaintiffs allege that the defendants have unlawfully delayed the adjudication of their visa applications, violating the APA and justifying the issuance of a writ of mandamus to compel the government to act.  See Compl. ¶¶ 60–68, 76–79.  The government has moved to dismiss both counts, arguing that they fail to state a claim.  The Court disagrees as to a narrow set of allegations underlying the delay claims—those going to the alleged refusal of the Department, and especially the Manila Embassy, to follow the stated prioritization policies.  Accordingly, the Court will allow these delay claims to survive the government's motion.

      The government first argues that the delay claims should be dismissed because, in its view, the plaintiffs improperly named as defendants the Secretary of State and the Department of State, rather than the consular officials in charge of their applications at the Embassy.  See MTD at 19.  The government points out that the Secretary has left the scheduling of interviews to the discretion of embassy and consulate chiefs.  Id.  It also suggests that scheduling interviews is "a responsibility reserved solely for consular officers," precluding the Court from ordering the Secretary of State to do so.  Id.  The plaintiffs rejoin that the Secretary of State has the authority to oversee and control the type of overarching policies they challenge here.  See Opp'n at 7–11.

The Court sides with the plaintiffs, who can properly challenge the unreasonable delay they claim to have suffered through suit against the Secretary and Department of State.  As even the government acknowledges, see MTD at 19, the Secretary has the authority to manage the operations of the State Department and the Foreign Service.  See 22 U.S.C. § 2651a(a)(3)(A) (giving Secretary "any authority vested by law in any office or official of the Department of State" and tasking him with administering the Foreign Service and Department personnel).  While the Secretary may have "left the discretion of when to conduct interviews" to consular chiefs, MTD at 19, that is simply a delegation of authority he undoubtedly possesses.  See Filazapovich, 2021 WL 4127726, at *15 (rejecting similar argument in challenge to deprioritizing of diversity visas).

Nor does anything in the Immigration and Nationality Act ("INA") preclude the Court from ordering the Secretary (through his subordinates at the National Visa Center or the Manila Embassy) to schedule the plaintiffs' visa interviews, as the government suggests.  The provisions and caselaw the government cites stand for a far more limited proposition:  that the INA reserves for consular officials the power to evaluate applications on the merits.  See Baan Rao Thai Rest. v. Pompeo, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (noting that INA "grants consular officers exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations"); Saavedra Bruno v. Albright, 197 F.3d 1153, 1156 (D.C. Cir. 1999) (explaining that, under INA, only consular officials can grant, deny, or revoke visas).  "Plaintiffs, however, are not challenging a consular officer's *adjudication* of their . . . visa application; they are challenging the . . . deprioritizing" of their applications in the adjudication queue.  Filazapovich, 2021 WL 4127726, at *15.  The government's case law does not "require[] suit against a consular officer to challenge such policy decisions."  Id.

The Court must therefore determine whether the plaintiffs have stated plausible claims for relief on their visa processing delay claims.  The APA "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,' 5 U.S.C. § 555(b), and authorizes a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed,' id. § 706(1)."  Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1099 (D.C. Cir. 2003).  The standards for challenging agency inaction under the APA and the Mandamus Act are the same. See Skalka v. Kelly, 246 F. Supp. 3d 147, 152 (D.D.C. 2017).  To evaluate the reasonableness of agency delay, courts in this Circuit apply the six-factor test established by Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC").  The TRAC test asks courts to evaluate the following factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

In re United Mine Workers of Am. Int'l Union, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting TRAC, 750 F.2d at 80).

These factors "are not ironclad, but rather are intended to provide useful guidance in assessing claims of agency delay." In re Core Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (internal quotation marks omitted). "In evaluating these factors, the Circuit has stressed that determining whether an agency's delay is unreasonable 'cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" Didban v. Pompeo, 435 F. Supp. 3d 168, 176 (D.D.C. 2020) (Cooper, J.) (quoting Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1102). Whether a delay is unreasonable is ultimately "a fact intensive inquiry," Nio v. U.S. Dep't of Homeland Sec., 270 F. Supp. 3d 49, 66 (D.D.C. 2017), which in some cases may be easier to conduct on a developed evidentiary record.

Applying the TRAC factors here, the Court holds that the plaintiffs have stated a plausible claim for relief with respect to any alleged delay caused by Department components' failure to follow the Department's own triage scheme for visa processing. The factual allegations underlying this claim overlap significantly with those for the plaintiffs' prioritization claim, which the Court dismissed above. But here, the plaintiffs' allegations about the Manila Embassy—that it has refused to follow stated Department priorities—could plausibly support a finding in their favor under the TRAC factors.[7] The government has not provided sufficient

---

[7] The majority of the plaintiffs who remain—57 fiancé pairs—have applications pending before the NVC, rather than the Manila Embassy. See Pl.'s Mar. 2022 Update at 2–4. Initially, it would seem that these plaintiffs have not (at least yet) been injured by the supposedly "rogue" Manila Embassy, which has not even received their files. If that were the case, the Court would necessarily dismiss them for lack of standing. See Lujan, 504 U.S. at 560–61. The Court will not do so on this record, however, given some uncertainty about the relationship between the NVC and the Manila Embassy, as alleged in the complaint.

reason to discount these allegations at the pleading stage, so the Court will not dismiss these claims.

### 1.  Factors One and Two

The Court starts with the first two <u>TRAC</u> factors—whether the agency's response time is governed by a rule of reason, and whether Congress has provided any timetable for agency action.  The two are often considered together, <u>see</u> <u>Milligan v. Pompeo</u>, 502 F. Supp. 3d 302, 317 (D.D.C. 2020), as the second factor—congressional judgment—may "supply content for this rule of reason," <u>In re Core Commc'ns</u>, 531 F.3d at 855.  However, the D.C. Circuit has called the first factor—the only one phrased as an imperative—the "most important." <u>Id.</u>  The plaintiffs' discussion of these initial factors centers largely on the experience of those with claims pending before the Manila Embassy.  They say the Embassy is "failing to follow" the rule of reason laid out by the Secretary of State's four-tier prioritization scheme, as well as the schedule envisioned

––––––––––––––––––––

Crucially, the Court can read the complaint in several ways that would give these plaintiffs standing.  The plaintiffs allege that the NVC has refused to send K-1 visa applications to the Manila Embassy until that Embassy resumes "routine" visa services.  <u>See</u> Compl. ¶ 9; Opp'n at 14.  The Court can conceive of at least three ways to read this allegation:  First, the plaintiffs could mean that the Manila Embassy is responsible for the backlog of K-1 visas at the NVC, too, by directing it not to transmit fiancé visa applications despite the Department's instructions to give them high priority.  Second, the plaintiffs may be claiming that the NVC has likewise "gone rogue," independently creating a holdup for K-1 visas despite their purportedly high-priority status.  Finally, the plaintiffs' allegations about the NVC may be entirely disconnected from either the Manila Embassy or the four-tier priority scheme the Department announced.  While the first two readings would give plaintiffs with applications at the NVC standing to bring the unreasonable delay claims at issue here, the third would not.

Because the plaintiffs with claims pending before the NVC have at least one viable route for invoking this Court's jurisdiction, for the purposes of this motion, the Court will treat them together with those plaintiffs with applications pending at the Manila Embassy.  However, on summary judgment, the plaintiffs will need to show they all have been injured because some component of the Department—whether the Embassy or the NVC—has flouted the rule of reason laid out in the centralized priority scheme.

by Congress.  <u>See</u> Opp'n at 13–16.  The Court concludes that the first factor favors the plaintiffs while the second largely favors the government.

The plaintiffs have plausibly alleged that the Manila Embassy is failing to follow the stated priorities of the Department, which provide the applicable rule of reason.  As the plaintiffs explain, in public statements, Department officials have framed the four-tier prioritization guidelines as mandatory ones that embassies and consulates "must follow."  <u>See</u> *Immigrant Visa Backlog Q&A*, U.S. Dep't of State, https://www.youtube.com/watch?v=S_G7kahqQN0&t=1s at 41:55–42:12 (May 25, 2021).  And the plaintiffs offer at least some evidence suggesting that the Manila Embassy is ignoring this directive.  In particular, the plaintiffs point to publicly available monthly reports of visas issued by type and by consular post over the last few years.[8]  As the plaintiffs calculate, before the pandemic, a large percent of the visas issued in Manila were K-1 visas—generally between 15 and 30 percent of the total number of K-1 and immigrant visas.[9] <u>See</u> Opp'n at 3–5.  But as the Embassy resumed consular services in earnest in the summer of 2020, the absolute number of K-1 visas issued at the Manila Embassy remained relatively flat— around 50 or 60 each month—even as the number of other visas rebounded.  <u>See</u> <u>id.</u>  From

_____

[8] The plaintiffs draw data from the Department's monthly visa issuance statistics for immigrant and non-immigrant visas.  <u>See</u> *Monthly Immigrant Visa Issuance Statistics*, U.S. Dep't of State Bureau of Consular Affs., https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/immigrant-visa-statistics/monthly-immigrant-visa-issuances.html (last visited Mar. 22, 2022) (listing all immigrant visa types); *Monthly Nonimmigrant Visa Issuance Statistics*, U.S. Dep't of State Bureau of Consular Affs., https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last visited Mar. 22, 2022) (listing all nonimmigrant visa types, including K-1 visas).  The Court has replicated and extended these calculations by comparing the number of K-1 visas and the number of immigrant visas issued each month through January 2022.

[9] As their denominator, the plaintiffs sum up the total number of K-1 visas and the total number of immigrant visas for each month.  The plaintiffs contend that this is the appropriate total because K-1 visas, though formally nonimmigrant visas, function similarly to immediate relative immigrant visas.  <u>See</u> Compl. ¶ 19.

December 2020 through April 2021—the months in the plaintiffs' data set when the tiered prioritization scheme was theoretically in place—between 2.5 and 7 percent of the relevant visas issued in Manila were K-1 visas. See id. These data are at least consistent with the allegation that the Manila Embassy was not following the reasonable prioritization scheme laid out by the Department.

Of course, this limited data set does not definitively establish that the Manila Embassy has gone rogue, or even that it is failing to prioritize K-1 visas properly. It is possible—as the government suggests—that the public information the plaintiffs rely on is an imperfect metric. See Reply at 10–12. Perhaps the Court should be looking at visas adjudicated rather than visas issued. Or maybe the mix of applications pending before the Manila Embassy has shifted from before the pandemic—providing a logical explanation why the proportion of them that are K-1 visas has fallen. It is likewise possible that the pattern the plaintiffs have identified was a mere momentary blip, as the Embassy adjusted to the new scheme. Indeed, the Court has examined the public data source the plaintiffs rely on, which has been updated through January 2022. In recent months, the proportion of resources dedicated to K-1 visas seemingly recovered. They were 20.2, 19, 16.7, and 14.2 percent of the total immigrant and K-1 visas issued in October, November, December, and January, respectively. The voluntary dismissal of dozens of plaintiffs from this case—at least some of whom have received the adjudications they sought—indicates that the pace of K-1 visa adjudication may have rebounded. Still, these questions cannot be answered on the record here. The government will have ample opportunity to challenge these statistics and provide alternate explanations for the Manila Embassy's processing rates at summary judgment.

The government's contrary arguments on the first factor are all unavailing.  It first contends that the rule of reason "is informed by" a congressional timetable, and argue that Congress has not provided one here.  <u>See</u> Reply at 9.  But the <u>TRAC</u> factors only suggest that a "statutory scheme *may* supply content for this rule of reason."  <u>In re Core Commc'ns</u>, 531 F.3d at 855 (emphasis added).  Here, the alleged rule of reason has been set by the Secretary of State, and the plaintiffs assert primarily that the Manila Embassy failed to follow that rule.  The government next claims that, under prevailing case law in this district, the plaintiffs' claims have not been pending long enough to violate any rule of reason.  <u>See</u> Reply at 10.  That argument may have purchase if the plaintiffs were making a pure delay challenge—as the oldest case has been pending for only 25 months.  <u>See</u> Pl.'s Mar. 2022 Update at 5; <u>Hulli v. Mayorkas</u>, 549 F. Supp. 3d 95, 100 (D.D.C. 2021) (Cooper, J.) (finding no authority for "proposition that delays ranging from fifteen to twenty-eight months violate the rule-of-reason requirement").  But plaintiffs do not challenge the pace of the Embassy's processing; they complain instead about its failure to order applications as the Department intended, causing them to wait longer than they otherwise would.

Finally, the government asserts that "the Secretary of State's decision-making has properly balanced the mission of the Department of State" with public health concerns during an "unprecedented pandemic."  Reply at 12.  That may be true.  But again, the plaintiffs expressly do not complain that they are "waiting in a line that is moving slowly due to COVID-19 operational challenges."  Compl. ¶ 56.  Rather, they contend that the Embassy is failing to follow the stated triage plan, and, as a result, is not adhering to the rule of reason that plan sets out.  At this stage, the Court concludes the plaintiffs have plausibly made this allegation.  The first factor thus favors the plaintiffs.

The Court now turns to the second factor—whether Congress has provided a timetable for that rule of reason.  As mentioned above, the plaintiffs' primary theory does not rely on any congressional mandate.  But they also contend that the Manila Embassy has failed to follow a congressional directive implicitly prioritizing fiancé and other family-based visas.  In particular, they point out that, in a two-decade old appropriations statute, Congress required the Department of State to adopt a policy to process K-1 visa applications "within 30 days of the receipt of all necessary documents."  Consolidated Appropriations Act, Pub. L. No. 106-113, § 237(a), 113 Stat. 1051, 1501A-430 (1999).  As even the plaintiffs concede, this is not a statutory deadline. See Opp'n at 15.  Congress never "translate[d] this policy preference into a specific timeline" the Department *must* follow.  Milligan, 502 F. Supp. 3d at 318.  Of course, a non-binding deadline may still be an "*indication* of the speed with which" Congress "expects the agency to proceed." Hulli, 549 F. Supp. 3d at 101 (quoting In re United Mine Workers, 190 F.3d at 549).

Crucially, however, even this aspirational processing goal seemingly does not apply to the vast majority of the plaintiffs' applications, most of which have not yet progressed to an interview.  See Pl.'s Mar. 2022 Update at 5 (listing only twelve applicants with interviews either scheduled, postponed, or completed).  As the State Department's Foreign Affairs Manual notes, the "interview with the consular officer is the most significant part of the visa issuing process"— where much of the "necessary information from the applicant" is received.  9 FAM 502.7-3(C)(2)(a)(1); see also 9 FAM 502.7-3(C)(3)(5) (explaining that applicants must provide "[p]roof of relationship to the petitioner *at the time of the interview*" (emphasis added)).  Because the "30-day time clock appears to begin only after the consular office has received all information," much of which is imparted at the interview, Milligan, 502 F. Supp. 3d at 318, it seems not to have begun ticking for many of the plaintiffs.  For those few who have been interviewed, the

Court holds that the second factor slightly favors the plaintiffs. But for the rest, this statutory guidance cannot support their request for an order to "immediate[ly] schedul[e]" an interview. See Compl. Request for Relief ¶ 4. The Court thus identifies no firm statutory timetable for processing most of the plaintiffs' visa applications, meaning the second factor narrowly favors the government as to those applicants.[10]

### 2. *Factors Three and Five*

The third and fifth TRAC factors often "run together," Milligan, 502 F. Supp. 3d at 319, and here favor the plaintiffs. The third instructs that delays may be "less tolerable when human health and welfare are at stake," and the fifth tells courts to consider "the nature and extent of the interests prejudiced by the delay." In re Core Commc'ns, 531 F.3d at 855. The plaintiffs allege that the deprioritizing of their applications and the resulting delay has left them "unable to start their lives together in the United States," causing "debilitating depression and anxiety" and complicating their ability "to have children together." Compl. ¶ 57. As this Court has previously held, these kinds of personal interests are "undeniably significant." Didban, 435 F. Supp. 3d at 177.

The government offers two responses, neither of which hits the mark. First, it argues that other applicants awaiting adjudication of immigrant visas are suffering the same kind of harm to health and welfare. See MTD at 28. Even if true, this argument more properly goes to the fourth factor—which focuses on whether plaintiffs are seeking to improperly jump in line. Second, the

_____

[10] Ordinarily, when there is no "congressionally supplied yardstick," courts turn to case law as a guide for "how long is too long to wait for agency action." Milligan, 502 F. Supp. 3d at 318 (internal citation and quotation marks omitted). However, the Court finds it unnecessary to do so because, as discussed above, the plaintiffs have provided a separate rule of reason for the Court to apply.

government asserts that the plaintiffs' health and welfare interests must be balanced against those of the consular officials the Department seeks to protect with its COVID-19 mitigation policies. See id. at 28–29.  But it cites no case requiring such a balancing of interests within the third and fifth TRAC factors, and other courts have rejected this exact argument.  See, e.g., Tate, 513 F. Supp. 3d at 150.  More to the point, the government's suggestion sidesteps the framing of the plaintiffs' claims.  They challenge not the delay caused by the pandemic itself, but rather the Embassy's alleged flouting of the triage system put in place to address pandemic-induced resource constraints.

### 3.  Factor Four

The fourth TRAC factor focuses on "the effect of relief on competing agency priorities." In re Barr Lab'ys, Inc., 930 F.2d 72, 75 (D.C. Cir. 1991).  Under this factor, which often carries "great[] weight," courts will "refuse to grant relief, even though all the other factors considered in TRAC favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  Milligan, 502 F. Supp. 3d at 319 (cleaned up) (quoting Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100).  At first glance, the fourth factor appears to be in significant tension with the plaintiffs' challenge, as the relief they seek "would simply reorder a queue of applicants."  Tate, 513 F. Supp. 3d at 149 (internal quotation marks omitted).  If all the plaintiffs challenged were the place in line the Department gave them, the Court might very well find this factor favored the government, perhaps dispositively so.  But here, the plaintiffs contend that *they are* the ones the Department has given a "higher or competing priority," TRAC, 750 F.2d at 80, and that the Department—by failing to control the Manila Embassy—has ignored its own preferences.  In this context, then, the Court does not see any evidence that the relief the plaintiffs seek would improperly harm

competing agency priorities.  At least at the motion to dismiss stage, the Court holds that this factor narrowly favors the plaintiffs.

        *4.   Factor Six*

The final <u>TRAC</u> factor asks about the appearance of impropriety.  The government contends that this factor favors them, and the plaintiffs offer no argument in response.  <u>See</u> MTD at 30; Reply at 18.  The Court agrees with the government, as the plaintiffs do not allege that any purported deprioritizing of their applications is nefarious or the result of ill will.

\* \* \*

In sum, the Court concludes that the majority of the <u>TRAC</u> factors narrowly favor the plaintiffs, at least on the present record and applying the appropriate standard of review at the motion to dismiss stage of the case.  The scope of these surviving claims, however, is narrow. The plaintiffs have only stated a claim to the extent that they challenge the Department's failure to follow its stated, mandatory triage system—primarily at the Manila Embassy, but potentially at the NVC or elsewhere.  On summary judgment, the government will have an opportunity to challenge more fully these limited claims and the evidence underlying them.  Given this narrow reading of the surviving claims, however, the Court will not accept on summary judgment any argument from the plaintiffs about the pace of processing or the Department's overall allocation of scarce financial and personnel resources during the pandemic.  Because those considerations are unrelated to the Department's alleged failure to follow the stated rule of reason, they are irrelevant to the plaintiffs' unreasonable delay claims.  And more broadly, the Court is mindful that the COVID-19 pandemic has upended life around the world, creating enormous "challenges" for the government "in determining how to best deploy scarce resources."  <u>Tate,</u>

513 F. Supp. 3d at 150.  The plaintiffs' remaining claims are not a vehicle to second-guess those decisions.

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Defendants' Motion to Dismiss.  The Court dismisses Count 2, but Counts 1 and 3 survive to be tested at summary judgment.  A separate Order shall accompany this memorandum opinion.


                                                  _____
                                                  CHRISTOPHER R. COOPER
                                                  United States District Judge

Date:  <u>March 22, 2022</u>